UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IN THE MATTER OF THE SEIZURE OF THE M/T PHONIX WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9198317, AND ALL PETROLEUM PRODUCT ONBOARD,<br><br>Defendants *In Rem*, | Civ. A. No. 26-cv-1405<br><br>**FILED UNDER SEAL** |

**GOVERNMENT'S SUPPLEMENTAL MOTION FOR INTERLOCUTORY SALE**

The United States of America ("the Government"), by and through undersigned counsel, hereby moves pursuant to Rule G(7)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules" or "Supp. R.") for an order authorizing the immediate interlocutory sale of property subject to forfeiture in this case, namely, the M/T PHONIX ("PHONIX"), bearing International Maritime Organization ("IMO") number 9198317 and the petroleum cargo laden thereon ("Defendant Property") in order to mitigate costs and preserve the value of the Defendant Property. In support of its motion, the Government respectfully states as follows:

**A. Background**

This *in rem* forfeiture action arises from an ongoing investigation by Homeland Security Investigations ("HSI") and the Federal Bureau of Investigation ("FBI") involving the transportation and sale of Iranian petroleum products for the benefit of sanctioned Iranian entities,

RECEIVED

JUN 03 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

including the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Quds Force ("IRGC-QF").

The PHONIX is an approximately 25-year-old crude oil tanker which was managed and operated by Vision Ship Management LPP ("Vision") which, on December 3, 2024, was designated by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") pursuant to Executive Order 13902, as amended, for operating in the petroleum sector of the Iranian economy. *See* https://home.treasury.gov/news/press-releases/jy2734.[1] The PHONIX has been also identified, under the same IMO, as the M/T LUNA LAKE, the M/T PACIFIC CHALLENGER, the M/T MAJESTIC X, and the M/T FORMOSAPETRO CHALLENGER.

According to OFAC, Vision managed and operated the PHONIX, which OFAC indicated carried millions of barrels of Iranian crude oil to Asia since 2022. *Id.* The PHONIX was identified as blocked property in which Vision had an interest and that the PHONIX, along with other vessels designated in the same action, "have collectively shipped tens of millions of barrels of oil for Iran." *Id.* The Verified Complaint for Forfeiture *In Rem* further documents the use of the PHONIX in furtherance of Iran's petroleum industry, *see* D.E. 1, ¶¶ 34-38, 42-51, and oil samples since discovered on the PHONIX following its seizure confirm that the oil cargo was supplied by the National Iranian Oil Company (commonly referred to as "NIOC") and loaded at the Jask Oil Terminal in Iran.

[1] According to a document recently found on the PHONIX, management of the vessel was transferred from Vision to Seaway Ship Management LLC ("Seaway") in January 2025, shortly after Vision's and the PHONIX's designation by OFAC. No contact information for Seaway has been identified in the documents found on the PHONIX that have been sent back to the United States to date. Changes in management, ownership, and other identifying features of designated vessels (such as its flag) are common following OFAC action against such vessels. The new entities are often affiliates of the former ones.




*Oil sample from the PHONIX (a/k/a MAJESTIC X), bearing NIOC label and NIOC and Iranian Oil Terminals Company (IOTC) sealing tag*

**B. <u>Procedural History</u>**

On April 24, 2026, the Government filed a Verified Civil Complaint for Forfeiture *In Rem* against the PHONIX and the petroleum cargo with which it was laden. With the filing of the Complaint the Government filed a Motion to Seal and Delay Entry of the Action on the public docket and a Motion for an Interlocutory Sale Order supported by a Declaration. On April 28, 2026, Chief Judge Boasberg ordered the sealing of the Verified Complaint and the ordered delay of entry on the public docket. D.E. 4.

On April 29, 2026, the Court ordered a "sealed status conference" which was eventually held on May 5, 2026, at which point the Court requested additional information, which is provided below.

**C. <u>The Declaration</u>**

Along with the filing of the Verified Complaint, the Government also filed a Motion for an Interlocutory Sale supported by a Declaration by Gene Patton, Chief of the Program Operations Unit for the U.S. Department of Justice, Criminal Division. According to the Declaration, Mr. Patton has overseen the coordination and seizure of the PHONIX and managed the sales of other complex assets.

a. <u>Vessel</u>

The Declaration indicated that, prior to the seizure, the Government anticipated spending approximately $15,000,000 "manning a custody crew, repairing serious safety and operational deficiencies, [and] maintaining and transiting the M/T PHONIX." The Declaration also indicated that this amount would increase by approximately $5,000,000 or more if the vessel due to "anticipated custody, transit, insurance, repairs, and preparation for hurricane season (roughly June through September)."

This is for a vessel worth approximately $3,000,000 or less due to its age, condition, and anticipated use if put back in the market.

b. <u>Cargo</u>

The Declaration also included the value of the petroleum cargo on board, which was estimated to be approximately 1.9 million barrels of Iran-origin oil valued between $130,000,000 and $140,000,000, depending on the quality of the petroleum and the spot price.

In the event the petroleum had to be offloaded, the storage costs were estimated to be $450,000 per month.

### D. Seizure of Assets Does Not Equate to Forfeiture of Assets

Under Supplemental Rule G, "[a] judgment of forfeiture may be entered only if the government published notice of the action[,]" and provided direct notice of this forfeiture action to potential claimants on the facts known to the Government. *See* Suppl. R. G(4)(a), (b). At this stage, the Government is not seeking a judgment forfeiture; rather, the Government is seeking an Order authorizing the sale of the Defendant Property in an effort to preserve its value.

The PHONIX is an approximately 25-year-old OFAC-sanctioned Very Large Crude Carrier (VLCC) that has various maintenance deficiencies that are requiring extensive investigation and attention, which has not yet been completed. The Government has spent more than $41 million repairing substantial safety deficiencies and maintaining the PHONIX, with that amount anticipated to significantly increase for offloading the cargo, land-based oil storage, further repairs, crew, insurance, and maintenance of the vessel. *See* Suppl. Patton Decl.

For reasons discussed further below, the instant matter was filed under seal to protect the investigation but also to protect the integrity of the vessel given it is inoperable. At this time, any potential claimants will not receive notice of this action until the Defendant Property is sold and the substitute *res* transferred to an interest-bearing account with a law enforcement agency or the U.S. Marshals Service. *See id.* This approach has been pursued and approved by this Court in various other matters where the Complaint was filed under seal along with a Motion for an Interlocutory Sale Order. *See, e.g., United States v. Motor Tanker Veronica Bearing International Maritime Number 9256860,* 26-cv-993 (AHA), (D.D.C. Mar. 27, 2026); *United States v. Motor Tanker Bella 1 Bearing International Maritime Number 9230880*, 26-cv-992 (RBW), (D.D.C.

Mar. 23, 2026); *United States v. All Petroleum-Product Cargo Aboard the Suez Rajan with International Maritime Number 9524475*, 23-cv-882 (CJN) (D.D.C. April 10, 2023); *United States v. All Petroleum-Product Cargo Aboard the Achilleas with International Maritime Number 9398072*, 21-cv-3054 (PLF) (D.D.C Feb. 3, 2021); *United States v. All Petroleum-Product Cargo Onboard the M/T Arina with International Maritime Number 9189952*, 21-cv-3234 (RDM) (D.D.C. Dec. 9, 2021).

In each of the aforementioned referenced matters involving the *Veronica*, *Bella 1*, *Achilleas*, *Arina* and *Suez Rajan*, the Complaint was filed under seal along with an accompanying motion for an interlocutory sale order allowing for the Government to confidentially inform buyers of the existence of the filed action to facilitate the sale of the asset that was at risk of depreciation. Upon sale of the seized asset, the substitute *res* was transferred to an interest-bearing account, the matter was immediately unsealed and the Government provided notice to the public and any potential claimants entitled to direct notice of the forfeiture action so that their claims can be adjudicated. In the actions involving the *Achilleas* and *Arina* referenced above, claimants filed claims, and those matters remain in various stages of litigation for the substitute *res*.

At this time, to protect the integrity of the ongoing investigation, the Defendant Property, the personnel onboard the Defendant Property, and the environment, the Government does not anticipate providing either publication or direct notice, under Supplemental Rule G(4) and (5), until after the Defendant Property is sold. However, upon sale of the Defendant Property, the Government will immediately request the Court unseal this matter which will allow the Government to provide notice to any claimants and litigate any claimed interests under the Supplemental Rules while maximizing the value of the substitute *res* that would be subject to further litigation without the associated depreciation and other costs.

### E. <u>Nature, Timing, and Amount of Expenses Involving the PHONIX</u>

When the PHONIX was intercepted by the Government under its Title 10 authorities, due to the Master of the vessel communicating Guyana flag registry (which the Guyana government confirmed to be false), the boarding team secured the vessel before law enforcement boarded and effectuated the seizure of the vessel.

In planning for the seizure of a fully-laden oil tanker in international waters, contingences are devised for a variety of unknown factors, including but not limited to: cooperation of the "legacy" crew; staging and salaries for replacement crew; services to inspect the engines, the boilers, and other onboard mechanical and navigational equipment; the general safety and security of the vessel; contracting with tugboats to tug the vessel to a safe location; refueling; coordinating provisions of food and water for the crew; insurance; and any costs associated with repairs—costs that at the initial boarding moment are often not known, but become known months later due to testing and inspections.

a. <u>Vessel</u>

The PHONIX requires extensive repairs including addressing the oxygen levels in the cargo tanks, investigating a main engine crack that has temporarily been fixed but requires an assessment on its condition and may require a permanent repair, oil cargo leaks, various repairs to address heavily-corroded cargo lines and components and compliance with the International Association of Classification Societies (IACS) requiring formal verification, protection and indemnity (P&I) insurance, and civil liability insurance under the Civil Liability Convention.

As a result, and planning for particular contingencies, the Government initially projected spending $15,000,000 "manning a custody crew, repairing serious safety and operational deficiencies, and maintaining and transiting the M/T PHONIX." *See* Patton Decl.

After boarding the PHONIX and conducting inspections, the Government has spent $41,821,593.53 related to the initial inspection, crew, insurance, and transfer of services as noted below:

| Costs | Amount |
|---|---|
| Staging and Transportation of Crew for Seizure and Handover | $2,136,240.00 |
| Crew Compensation | $2.261,801.51 |
| Tugs and Other Offshore Support Vessels | $4,766,600.00 |
| Repairs and Replacement of Vessel Mechanical Systems | $78,000.00 |
| Fuel | $3,250,000.00 |
| Salvage Operations | $1,296,952.02 |
| Ship to Ship transfers (Offloading Cargo) | $25,000,000.00 |
| Insurance | $1,032,000.00 |
| Environmental and anti-pollution equipment | $2,000,000 |
| | |
| **TOTAL** | $41,821,593.53 |

*See* Suppl. Patton Decl.

The magnitude of expenses already incurred by the Government indicate the poor and worsening condition of the PHONIX. The above-cited figure does not include storage, or "layberth" expenses of $700,000 per month for the vessel to remain (after discharge of the cargo to a land-based secure facility) in a designated safe mooring space to remain idle and undergo maintenance. *Id.* Further, it does not include the estimated land-based storage expenses of $450,000 per month or the potential cost of transiting the vessel to the United States. Given the expense for a legitimate maritime company to put this vessel into legitimate service, the Government expects that prospective purchasers are likely to be salvage companies located in the region where the vessel is located.

b. <u>Cargo</u>

As noted in the initial Declaration, the petroleum cargo on board the PHONIX is worth between $130,000,000 and $140,000,000 depending on quality and the spot price at the time.

Land-based storage costs for the petroleum cargo portion of the Defendant Property are estimated to be $450,000 per month. *Id.* These costs are associated with the offload storage facilities. *Id.*

Offloading the cargo to land-based storage prevents continued stress on the vessel and risk to the environment but also maintains the quality and condition of the petroleum cargo which would be degraded and less valuable if critical systems (such as the boiler) unexpectedly become nonfunctioning on an over 20-year-old vessel that has neither transited to legitimate ports of call nor been properly maintained since beginning its service in the Iranian ghost fleet.

**F. <u>Selected Cases Where Interlocutory Sales Have been Ordered in Sealed Matters</u>**

The Government has engaged in various tanker seizures that involved the filing and issuance of interlocutory sale orders of the vessel and/or cargo. As in this case, the interlocutory sale argument has been the same, based on: the age of the these "ghost fleet" vessels, the fact that their maintenance has been insufficient, the fact that their insurance is insufficient or potentially fraudulent, and the fact that the market value to place these vessels back into service well exceeds the repair and maintenance costs of doing so for a legitimate carrier that would carry cargo to legitimate areas of the world.

As a result, to preserve the maximum market value of the assets (cargo and, depending on the case, vessel), the Government has sought and obtained interlocutory sale orders to preserve the maximum value of the asset(s) for the benefit of whoever prevails in the civil forfeiture case, be it the Government, owner claimant, or terrorism victim claimant. Below is a list of tanker cases in which interlocutory sale orders were requested and issued as of the date of this filing.

a. *United States v. Motor Tanker Tifani with International Maritime Organization Number 9273337, and the Oil Cargo Laden Theron*, 26-cv-1373 (JEB) (D.D.C. Apr. 22, 2026) ("Tifani")

The Government filed this sealed action and subsequently filed a sealed motion for an interlocutory sale order to dispose of the TIFANI vessel and the cargo on board. On May 20, 2026, Chief Judge James E. Boasberg, in a lengthy Memorandum and Opinion, granted the Government's motion. *See* Tifani, D.E. 6. The matter remains sealed and the Government intends to unseal after the sale of the vessel and cargo while the substitute *res* is held in an interest-bearing account. The justification for the motion was the same as in this case. The Tifani case does have one procedural difference from the other cases cited in this brief—namely, even though he granted the Government's motion for interlocutory sale and to seal, Judge Boasberg ordered the Government to provide pre-sale direct notice to known potential claimants, focusing on the TIFANI's owner and management company. Importantly, however, in that case the Government possessed contact information for the TIFANI's owner and management company, so providing such direct notice was practicable. By contrast, the Government does not at this time possess contact information for the PHONIX's owner or management company. *See* fn. 1, *supra*.

b. *United States v. All Petroleum-Product Cargo Aboard the Achilleas with International Maritime Organization Number 9398072*, 21-cv-305 (PLF) (D.D.C. Feb. 2, 2021) ("Achilleas").

The Government filed this sealed action and subsequently filed a sealed motion for an interlocutory sale order to dispose of the cargo to preserve the asset. *Achilleas*, 21-cv-305, D.E. 3 (Feb. 3, 2021). On February 5, 2021, Senior Judge Paul Friedman ordered the sealed interlocutory sale of the cargo, over two months before any claimant received notice of the forfeiture action. *Id.* at D.E. 4. The justification for the motion was the same as in this case.

c. *United States v. All Petroleum-Product Cargo Aboard the Suez Rajan with International Maritime Number 9524475*, 23-cv-882 (CJN) (D.D.C. April 10, 2023) ("Suez Rajan").

The Government filed this sealed action on March 21, 2023, which had a related criminal case. *United States v. Empire Navigation et. al.*, 23-cr-88 (CJN). Judge Carl J. Nichols approved the interlocutory sale of the cargo onboard the Suez Rajan as the vessel traversed from Singapore to the United States to allow the Government to coordinate the sale before offloading. *See Suez Rajan*, D.E. 7. The Court in fact agreed to modify the sealing order to allow the Government to unseal both the civil and criminal matters when the safety and security of the crew was confirmed. *See Suez Rajan*, Minute Entry, Sept. 8, 2023. After the sale of the cargo, the Government unsealed the action and proceeded with its notice obligations under Rule G.

d. *United States v. All Petroleum-Product Cargo Onboard the M/T Arina with International Maritime Number 9189952*, 21-cv-3234 (RDM) (D.D.C. Dec. 9, 2021) ("Arina")

The Government filed this sealed action on December 9, 2021. *Arina*, D.E. 1. The Government filed a sealed motion for interlocutory sale of the cargo which was granted by Judge Randolph D. Moss on December 13, 2021. *Id.*, D.E. 7. Upon disposition of the cargo, and upon the Government's motion, the Court unsealed the action on February 28, 2022, notice was provided to potential claimants, and litigation has continued on claims for the substitute *res.*

e. *United States v. Motor Tanker Bella 1 Bearing International Maritime Number 9230880*, 26-cv-992 (RBW), (D.D.C. Mar. 23, 2026) ("Bella 1")

The Government filed this sealed action on March 23, 2026, against a vessel that was determined to be stateless after communications with the flag state, and that subsequently attempted to flee interdiction. The Government requested interlocutory sale of the vessel, which was granted by Judge Reggie B. Walton on April 7, 2026. The case remains under seal, but there is a preliminary sale agreement with a purchaser. Once the sale agreement is finalized, the Government intends to unseal the action and proceed through the notice procedures under Rule G.

f. *United States v. Motor Tanker Veronica Bearing International Maritime Number 9256860,* 26-cv-993 (AHA), (D.D.C. Mar. 27, 2026) ("Veronica")

The Government filed this sealed action on March 23, 2026. The Government requested interlocutory of the vessel, which was granted by Judge Amir H. Ali on April 28, 2026. The case remains under seal, but there is a preliminary sale agreement with a purchaser. Once the sale agreement is finalized, the Government intends to unseal the action and proceed through the notice procedures under Rule G.

Further, there are other sealed matters involving seizures of tankers supporting the Iranian regime and the IRGC that are pending decisions on interlocutory sale motions.

## G. Government's Procedures for an Interlocutory Sale

a. *Process*

In compliance with the Rules, the Government intends to engage in a sale of the Defendant Property at commercially reasonable market value for seized properties. As noted in the Patton Declarations, the Government declines to execute sales when there is no offer for a reasonable market value for the assets. *See* Patton Decl. 1, 2.

Specifically, in the vessel context, the Government engages with various shipping and salvage companies to determine interest in the sale of the vessel, which requires due diligence on potential purchasers regarding their previous activity and if the vessel would be put back into service of the Iranian Ghost fleet, a known concern given the age and lack of maintenance of these vessels.

In the cargo context, the Government would communicate with various potential purchasers who have the ability to refine very heavy and high sulfur content crude oil. The list of oil providers that have the facilities and expertise to refine Iranian crude is very limited given its poor quality.

b. *Supplemental Rule G(7)(b)(iii) and the Requirements of 28 U.S.C. § 2001*

This sale procedure complies with the Supplemental Rules. Specifically, the Court voiced concerns regarding compliance with 28 U.S.C. § 2001. However, the Government notes that 28 U.S.C. § 2001 references the sale of real property. Sale of personal property is governed instead by 28 U.S.C. § 2004, which says: "Any personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, *unless the court orders otherwise*." (emphasis added). Thus, by Section 2004's plain terms, the Court is free to deviate from Section 2001 procedures when it comes to sale of personal property, like the PHONIX. *See, e.g., S.E.C. v. Wilson*, No. 12-CV-15062, 2013 WL 1283437, at *1 (E.D. Mich. Mar. 28, 2013) ("for the sale of personal property a court may require that the sale comply with the strictures of § 2001, but a court may also make an exception. It may order otherwise.").

Here, there are compelling grounds to deviate from Section 2001's provisions. First, Section 2001 presumptively requires a public sale "at the courthouse of the county, parish, or city in which the greater part of the property is located," 28 U.S.C. § 2001(a), but this makes no sense for a vessel like the PHONIX that is not located within *any* city, county, or parish. To avoid public sale, Section 2001 requires a noticed hearing, 28 U.S.C. § 2001(b), which would be impractical for a sealed case like this one. It also requires appraisals by three separate individuals or groups, which would be difficult and time-consuming to arrange given the PHONIX's remote location in the Indian Ocean. It also requires newspaper publication, which would further delay sale in a situation where the PHONIX is a wasting, depreciating asset that is highly vulnerable to hurricane and monsoon season. In short, applying the provisions of Section 2001 are inappropriate for interlocutory sale of the PHONIX. This creates a compelling case for the Court to deviate from Section 2001, as the Court is expressly authorized to do under Section 2004.

c. *Notice is not Required Before an Interlocutory Sale is Ordered*

In the past, courts in this District have not required notice to be provided in a sealed action with a pending motion for an interlocutory sale order. *See, e.g., United States v. All Petroleum-Product Cargo Aboard the Achilleas with International Maritime Organization Number 9398072)*, 21-cv-305 (PLF) (D.D.C. Feb. 2, 2021); *United States v. All Petroleum-Product Cargo Aboard the Suez Rajan with International Maritime Number 9524475*, 23-cv-882 (CJN) (D.D.C. April 10, 2023); *United States v. All Petroleum-Product Cargo Onboard the M/T Arina with International Maritime Number 9189952*, 21-cv-3234 (RDM) (D.D.C. Dec. 9, 2021); *United States v. Motor Tanker Bella 1 Bearing International Maritime Number 9230880*, 26-cv-992 (RBW), (D.D.C. Mar. 23, 2026); *United States v. Moto Tanker Veronica Bearing International Maritime Number 9256860,* 26-cv-993 (AHA) (D.D.C. Mar. 27, 2026).

Pursuant to Supplemental Rule G(7)(b)(i), a party having custody of the property may request that the property be sold if "(A) the property is perishable or at risk of deterioration, decay, or injury by being detained in custody pending the action; (B) the expense of keeping the property is excessive or is disproportionate to its fair market value; (C) the property is subject to a mortgage or to taxes on which the owner is in default; or (D) the court finds other good cause."

The Government's request in this case projected $15 million in costs. After the seizure and inspection of the vessel, that cost increased to over $41 million and is anticipated to increase after further inspection assessments if they determine permanent repair is necessary and for preparation for future weather conditions. *See* Suppl. Patton Decl.

The Government's motive in this matter is not to deprive any claimant of their property, but rather to sustain the value of the property in the form of substitute *res* to ensure the value of

the property is maximized if the claimant owner, a claimant terrorism victim, or the Government prevails in the ultimate forfeiture of this matter.

### H. The Government's interpretation of Rule G(7)(b)(1)(B)'s phrase "excessive or [] disproportionate to its fair market value" — *see United States v. M/Y Amadea*, No. 1:23-cv-9304, 2024 WL 2946071 (S.D.N.Y. June 11, 2024)

Leaving aside for the moment the word "excessive" (*see infra*), the meaning of the phrase "disproportionate to its fair market value" is relatively straightforward and was not disputed in the *Amadea* case.[2] Costs are "disproportionate" to an asset's fair market value if they are notably high relative to the asset's fair market value. There is no mathematical cut-off for determining disproportionality—*i.e.*, Rule G does not say that interlocutory sale should be granted if costs exceed X percent of the asset's fair market value. However, caselaw is instructive, and courts have often granted interlocutory sale where monthly maintenance expenses approached .5% of the asset's fair market value. In some cases, courts granted interlocutory sale even when maintenance costs were far less than that. *See, e.g., United States v. M/Y Galactica Star et al.*, No. 4:17-cv-02166 (S.D. Tex.), ECF No. 194 and 3.20.19 Minute Order (ordering interlocutory sale based on $170,000 in monthly costs for yacht later re-sold for $37,400,000 (.45% of asset value); *United States v. One 2005 Lagoon 440 Sailing Catamaran*, No. CV 13-9262, 2017 WL 10573808 (C.D. Cal. Sept. 22, 2017) ($1,200 in monthly costs for boat with list price of $430,500 (.27% of asset value)); *United States v. Any & All Funds in UBS AG*, Account Number XXXX1138, 628 Fed. App'x 296 (5th Cir. 2016) ($1,700 in monthly costs for airplane worth $2,250,000 (.07% of asset value)); *Caterpillar Fin. Servs. Corp. v. Coleman*, No. 99-03821, 1999 WL 33218595 (C.D. Cal. Aug. 19, 1999) ($1,400 in monthly costs for vessel worth $325,000 (.43% of asset value)); *Freret*

[2] Undersigned counsel Joshua L. Sohn was counsel of record in the *Amadea* case and briefed and argued the interlocutory sale motion in that case.

*Marine Supply v. M/V ENCHANTED CAPRI*, No. 00-3805, 2001 WL 649764 (E.D. La. June 11, 2001) ($45,000 in monthly costs for cruise ship worth $12,000,000 (.37% of asset value)); *United States v. $1,133,648.97 et al.*, No. 07-175, ECF Nos. 49-2, 68, 125 (D. Haw.) ($2,850 in monthly costs for cars later sold for $1,200,000 (.23% of asset value)).

Under this proportionality analysis, it is indisputable that interlocutory sale is appropriate for the PHONIX. Maintenance costs for the PHONIX outstrip the asset's fair market value many times over. Interlocutory sale for the PHONIX's petroleum cargo may be a closer call under a proportionality analysis, but the cargo's maintenance costs of $450,000 per month against a fair market value of $130-$140M equates to monthly maintenance costs of about .35% asset value, which is comparable to the above-cited cases where courts granted interlocutory sale. Indeed, in the recent *Tifani* case, Judge Boasberg granted interlocutory sale on the "disproportionate" prong for oil cargo that had the same $130M-$140M market value and $450,000 per month storage costs. *See Tifani*, No. 1:26-cv-1373, D.E. 6 at 4-5.

Defining the term "excessive" in Rule G(7)(b)(1)(B) is not as straightforward. The *Amadea* court itself noted "the absence of binding precedent or helpful authority discussing the meaning of 'excessive' as used in the Rule." *Amadea*, 2024 WL 2946071 at *4. Nonetheless, the *Amadea* court ultimately defined the term this way:

> Given the absence of binding precedent or helpful authority discussing the meaning of "excessive" as used in the Rule, this Court will give the word its common, ordinary meaning of "more than what is usual or proper." . . . . Thus, in assessing whether the maintenance costs of the *Amadea* are excessive, the Court must not look solely at the total dollar amount of the maintenance costs, but must principally consider whether those amounts are more than what is usual as compared to the maintenance costs **for other similar yachts.**

*Id.* (emphasis added).

The Government believes that the *Amadea* court's definition is *mostly* supportable but falters at the final bolded phrase. *Amadea* was a case involving a yacht, but the *Amadea* court took an overly-restrictive view by comparing the *Amadea*'s maintenance costs to the maintenance costs of "similar yachts." Under that restrictive view, maintenance costs for an extremely expensive class of property (like a superyacht) could never be deemed "excessive" as long as the costs for the defendant superyacht were not above the costs for similar superyachts. This restrictive view allows for heavy drains on public funds. It is an odd construction of "excessive" that would force the Government to continue paying these costs and prohibit interlocutory sale.

The better comparative analysis for "excessive" is this: costs for maintaining a defendant asset are "excessive" when they are more than what is usual as compared to the costs **for other assets of similar value.** For example, the yacht in *Amadea* had an assessed value of approximately $225M. But the *Amadea*'s maintenance costs of $700,000 per month were far greater than the maintenance costs for almost any other type of $225M asset. Maintaining $225M in cash has no cost—the Government could put the money in a bank and earn interest. Maintaining $225M in securities incurs limited costs in brokerage fees. Maintaining a $225M piece of land may incur more costs, like property maintenance and potential security controls, but nothing close to the costs for maintenance for a superyacht. In sum, yachts are exceedingly expensive to maintain compared to other property of similar value, and that should have been sufficient to label the *Amadea*'s maintenance costs "excessive" even if these costs were not more than usual as compared to the maintenance costs **for other similar yachts.**[3]

[3] *See also* Stefan D. Cassella, "Confiscation and Forfeiture—Making It Work *or* Why is it taking so long to forfeit the Russian yachts?", 46 *Company Lawyer*, Issue 8 at 295 (Thompson Reuters 2025), available at https://assetforfeiturelaw.us/?p=3680 (criticizing the *Amadea* court's analysis and suggesting that "excessive" should be determined by reference to other assets of similar value).

Under this analysis, the maintenance costs for the PHONIX are clearly "excessive"—it is hard to imagine any other $3M asset that costs so much to maintain. The petroleum cargo's costs are also "excessive," as few other types of assets in the $130M-$140M range would cost $450,000 per month to maintain. Consider $130-$140M in securities, or a $130M-$140M piece of land, or a Renaissance painting or jewelry set worth $130M-$140M. It is likely that none of those assets would require even close to $450,000 per month to maintain. Because the petroleum cargo's maintenance costs are more than usual relative to other assets of similar value, these maintenance costs should be deemed "excessive" under Rule G(7)(b)(1)(B).[4]

## I. <u>Unsealing at this Time would Prejudice the Criminal Investigation and Endanger Personnel in the Region</u>

For decades, the D.C. Circuit has recognized a common law right to public records and documents, *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996), which includes the right to access "judicial records," defined as those "documents intended to influence a judge's decisionmaking." *In re Press Application for Access to Judicial Records in Case No. 23-SC-31*, 704 F.Supp.3d 161, 168 (D.D.C. 2023). However, this right is not a guarantee and may be overcome where the "government's interest in keeping the document[s] secret outweighs the public's interest in disclosure." *In re: The Reporters Committee for Freedom of the Press*, 128 F.Supp.3d 238, 241 (D.D.C. 2015) (citing *Wash. Legal Found.*, 89 F.3d at 899) (internal quotations omitted). The D.C. Circuit developed a six-prong test, known as the *Hubbard* factors, by which to evaluate the "various public and private interests at stake." *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 666 (D.C. Cir. 2017). The test serves as "our [*i.e.*,

---

[4] The Government further notes that the *Amadea* court correctly held that "excessive" and "disproportionate" are disjunctive tests in Rule G(7)(b)(i)(B)—satisfying either test justifies interlocutory sale. *Amadea*, 2024 WL 2946071 at *2.

the D.C. Circuit's] lodestar" involving decisions to seal or unseal judicial records. *Id.* The six factors are:

(1) the need for public access to the documents at issue;

(2) the extent of previous public access to the documents;

(3) the fact that someone has objected to disclosure, and the identity of that person;

(4) the strength of any property and privacy interests asserted;

(5) the possibility of prejudice to those opposing disclosure; and

(6) the purposes for which the documents were introduced during the judicial proceedings.

*In re New York Times Co.*, 2021 WL 5769444, *4 (D.D.C. 2021) (citing *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)); *see also United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980). A finding in favor of the Government under the *Hubbard* factors could "act to overcome th[e] presumption in favor of access" and justify the continued temporary sealing of the action. *Id.* (internal quotations omitted).

*a. Factor One: Need for Public Access*

There is a strong presumption of transparency in judicial proceedings in which the Government is a party. *Nat'l Children's Ctr.*, 98 F.3d at 1409. Of course, the Government is a party in this case, and the subject matter—the seizure of a vessel and oil cargo used to generate revenue for a designated state sponsor of terror that, along with its terrorist proxies, is actively engaged in hostilities with and planning attacks on the United States, our armed forces, and our allies—is one of significant public concern. However, releasing, at this time, "information about the identities of third parties and details about law enforcement's investigative techniques does not aid" this significant public interest and weighs against disclosure. *In re Los Angeles Times Comm'ns LLC*, 628 F.Supp.3d 55, 65 (D.D.C. 2022).

The PHONIX remains in the Indian Ocean in the general vicinity of its place of interdiction and seizure. The criminal investigation with respect to the vessel and the Iranian and non-Iranian individuals and entities responsible for its operations in support of Iran, NIOC, and the IRGC is ongoing, including the review of documents and devices obtained from the PHONIX, which are only now starting to flow back to the parts of the investigative team in the United States. In addition, third-party contractors are on the vessel and in the surrounding area. Identification of these companies who are actively assisting the Government in its efforts to disrupt Iranian revenue generation could lead to threats of retribution against those companies, which Iran has shown the capability and willingness to act upon in the past.

*b. Factor Two: Extent of Previous Public Access*

Premature unsealing of information that has never been made accessible to the public causes more harm than the release of information already available to them. *See Friedman v. Sebelius*, 672 F.Supp.2d 54, 59 (D.D.C. 2009). The public's previous access to sealed information in this matter has been limited. The Department of Justice filed this matter under seal to ensure the security of the ongoing operation, the safety of the crew, vessel, and government personnel in the area, and to prevent any delays that would cause degradation of the oil cargo on board or further diminish the value of the vessel. The U.S. Attorney for the District of Columbia and several government agencies over which the Department of Justice has no or limited control announced the seizure of the PHONIX, but such announcements provided little to no information about the instant proceedings or the current state or location of the PHONIX or its cargo (most merely acknowledged that an interdiction took place), and no document involved in the matter has been made publicly accessible. While the public announcements exist, the public's access to information related to this matter cannot be described as substantial, which weighs against

unsealing. *See, e.g.*, *Washington Post v. Robinson*, 935 F.2d 282, 292 (D.C. Cir. 1991) (citing *CBS, Inc. v. United States Dist. Court*, 765 F.2d 823 (9th Cir. 1985), noting continued sealing may not be necessary when "*most of the information* the government seeks to keep confidential concerns matters that might easily be surmised from what is already in the public record"); *In re Application of N.Y. Times Co. for Access to Certain Sealed Ct. Recs.*, 585 F. Supp. 2d 83, 93 (D.D.C. 2008) (ordering the disclosure of documents where "*much of the critical information* is already in the public forum"); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 520 F.Supp.3d 71, 83 (D.D.C. 2020) (ordering disclosure where "*a considerable amount of the information*" included in the sealed documents is in the public domain) (emphasis added throughout).

*c. Factor 3: Objection to Disclosure and Identity of Objector*

As outlined in the Motion to Seal, Motion for Interlocutory Sale, and this Memorandum in Support, the Department of Justice objects to unsealing the matter at this time. Unsurprisingly, the Department often finds itself in this role because the Department "has a unique interest in protecting the integrity of its investigations." *In re New York Times Co.*, 2021 WL 5769444 at *5. Indeed, the very nature of the sealing makes it difficult or impossible for other third-parties who might oppose unsealing—such as sources, witnesses, contractors, Coast Guard or military personnel, other government departments, or a specific law-enforcement officer, all of which are implicated in this matter—to object without revealing the information the Government seeks to protect. *Id.* Thus, this factor weighs in favor of the Government's position. *Id.*

*d. Factors 4 & 5: Protection of Law-Enforcement and National Security Interests*

The fourth and fifth factors in the *Hubbard* test are often considered together and focus on "to what extent harm to legitimate interests, including privacy or law enforcement interests, would

result from unsealing" the instant matter. *In re Los Angeles Times Comm'ns LLC*, 628 F.Supp.3d at 66; *see also In re New York Times Co.*, 2021 WL 5769444 at *5. These factors usually are also the weightiest factors in the analysis. *See, e.g.*, *In re Press Application for Access to Judicial Records in Case No. 23-SC-31*, 704 F.Supp.3d at 172; *In re New York Times Co.*, 2021 WL 5769444 at *5.

Here, premature disclosure of the action at this stage would (i) harm the ongoing criminal investigation into the vessel and the Iranian and non-Iranian individuals and entities responsible for its operations in support of Iran, NIOC, and the IRGC; (ii) reveal investigative techniques used by law enforcement in investigating terrorism financing, revenue generation, and sanctions evasion conspiracies, especially in the oil smuggling context; and (iii) harm legitimate national security interests.

Taking each in turn, courts in this District have repeatedly found that "the undeniable need to protect an ongoing criminal investigation tips the balance toward the Government's request to continue sealing." *In re Press Application for Access to Judicial Records in Case No. 23-SC-31*, 704 F.Supp.3d at 173. The parts of the investigative team that boarded and searched the PHONIX have been unable to locate bills of lading identifying any purchaser of the oil cargo onboard the PHONIX. The only bills of lading identified in the document review indicate that ownership remains with NIOC (a Specially Designated Global Terrorist), which—as alleged in the sealed forfeiture complaint—is closely associated with and operates for the benefit of Iran, including the IRGC, a designated foreign terrorist organization. The Department and our law enforcement partners continue to investigate the smuggling scheme responsible for operating the PHONIX in support of Iran, NIOC, and the IRGC. Premature disclosure of this matter would jeopardize these investigative efforts.

Related to the above, premature disclosure would also reveal investigative techniques that are brought to bear on the Iranian oil smuggling problem set, revenue of which supports Iran and its proxies. Steps taken to identify the parties to oil smuggling transactions, preserve the historical communications between those parties and the vessel and between the parties themselves, commercial and other sources used to compile the underlying information supporting seizure and forfeiture, and other techniques could be compromised by premature disclosure and could cause the subjects of this and other terrorism financing and sanctions evasion investigations to change their conduct to evade detection and otherwise thwart future investigations of similar conduct. These considerations also weigh in favor of continued sealing. *In re Los Angeles Times Commun's LLC*, 628 F.Supp.3d at 67.

Next, while the PHONIX is now in Department custody (or, more precisely, the custody of third-party contractors acting on behalf of the Department), the operation to effect seizure and disposition of the vessel is far from finished, and the ongoing efforts implicate significant national security interests. The United States remains in active hostilities with Iran, and the United States armed forces have implemented a blockade of Iranian ports. As recently as June 2, 2026, media outlets reported that Iran and the United States "exchanged heavy fire" in the Middle East, targeting land- and sea-based assets. *See* https://www.wsj.com/world/middle-east/u-s-iran-trade-heavy-fire-in-persian-gulf-testing-fragile-ceasefire-d4787573?mod=hp_lead_pos2. As noted above and in other filings submitted to this Court in connection with the PHONIX, the oil cargo currently aboard the PHONIX belongs to NIOC and the revenue generated from its sale would likely go to support Iran's armed forces, including elements of the IRGC. In *Hubbard*, the D.C. Circuit specifically stated that "this country's common law tradition of public access to records of a judicial proceeding" is not without its "time-honored exceptions," including temporary and

permanent exclusion from public access when guarding against risks to national security. *Hubbard*, 650 F.2d at 315-316 (citing *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589 (1978)).

Further to the above, and as noted throughout, Government personnel – including law enforcement, Coast Guard, and members of the armed forces – and Government-contracted personnel remain in the region and in close proximity to the PHONIX. Premature disclosure of the instant matter, which would include information about the location of the PHONIX, the locations, identity, and capabilities (or lack thereof) of Government vessels in the region supporting the interdiction, and the identity of Government-contracted companies and their employees could place each of these individuals and entities at immediate risk of retaliation by Iran, which has shown the capability and willingness to engage in retaliatory actions against seized vessels and entities supporting their seizure. *See* https://www.bbc.com/news/world-middle-east-67948119. Courts in this District routinely hold that "safety concerns may be a compelling interest that overrides the public's right of access to information." *See Washington Post*, 935 F.2d at 289; *In re: The Reporters Committee for Freedom of the Press*, 128 F.Supp.3d at 241 (D.D.C. 2015).

These latter considerations illuminate one of the primary reasons that the case involving the M/T SKIPPER, *United States v. Motor Tanker Skipper Bearing International Maritime Number 9304667, and Oil Cargo Laden Thereon*, 26-cv-697 (CJN) (D.D.C. Feb. 26, 2026), was not filed under seal. At the time the forfeiture case against the SKIPPER was filed, Department-supported action in the Caribbean was waning and one of the primary threats to safety and national security in the region—represented by the illegitimate regime of Nicolas Maduro in Venezuela—was dismantled. The security posture at the time of the filing of the SKIPPER forfeiture case is far different from the current realities in the Middle East and other relevant regions at the time of the filing of the PHONIX action. However, filing the SKIPPER action unsealed has resulted in

numerous claims, including from the purported owner of the SKIPPER and four groups of judgement creditor claimants. Two of these claimants, involving the purported SKIPPER owner and one of the groups of judgement creditors, contemplate returning the SKIPPER to service, which raises serious national security concerns that the vessel could fall back into ghost fleet activity. This delay has caused the Government to spend over $60,000,000 on maintaining the vessel and cargo, an event we hope not to repeat.

*e. Factor 6: Purposes for which the Documents were Introduced*

The final *Hubbard* factor may not be ripe for assessment, but it likely weighs in favor of unsealing: "[d]isclosure is the norm where the parties explicitly intend the Court to rely on the sealed materials in adjudicating their dispute." *In re Press Application for Access to Judicial Records in Case No. 23-SC-31*, 704 F.Supp.3d at 173. The Government concedes that it is asking the Court to do just that.

However, on balance, and considering the privacy, law enforcement, and national security interests outlined above—including the integrity of ongoing criminal investigations and the safety of Government and Government-contracted personnel—we respectfully submit that continued sealing of the instant matter at the present time is justified. *Id.*

WHEREFORE, the United States of America respectfully moves that the Court enter the attached Order granting its motion for interlocutory sale of the Defendant Property.

Dated: June 3, 2026
Washington, D.C.

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By: *_/s/ Rajbir Datta_*
Rajbir Datta
N.Y Bar 5206073
Assistant United States Attorney
National Security Section
U.S. Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20579
(202) 252-7687
Rajbir.Datta@usdoj.gov

John Eisenberg
Assistant Attorney General
National Security Division

By: /s/ Sean Heiden
Sean Heiden
D.C. Bar 1617636
Acting Deputy Chief
Counterintelligence and Export Control
National Security Division
U.S. Department of Justice
Sean.heiden2@usdoj.gov

Margaret A. Moeser
Chief
Money Laundering, Narcotics and Forfeiture
Section, Criminal Division
U.S. Department of Justice

By: */s/ Joshua L. Sohn*
Joshua L. Sohn
Trial Attorney