**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

MOTOR TANKER PHONIX WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9198317, AND ALL PETROLEUM PRODUCT ONBOARD,

*Defendant*.

Civil Action No. 26-1405 (SLS)
Judge Sparkle L. Sooknanan

**MEMORANDUM OPINION**

In April 2026, the United States seized the PHONIX, an oil tanker carrying approximately 1.9 million barrels of oil. The United States alleges that the oil is of Iranian origin and subject to forfeiture. It sued the PHONIX and its cargo for forfeiture *in rem*. And it immediately asked to seal this case and for permission to sell all the defendant property interlocutorily. To put it plainly, the United States is asking to sell the property in secret to a buyer of its choice before any potential claimant has notice or an opportunity to object to the sale.

As an initial matter, the Court concludes that it is no longer appropriate to maintain this case under seal in its entirety. The United States itself trumpeted its seizure of the PHONIX on social media, and the existence of this forfeiture action has since been widely reported. And while the United States has advanced important interests that risk being harmed by public disclosure of certain information in this case, it has not explained why a less drastic remedy—such as sealing or redacting particular documents—would be insufficient to allay that risk.

On the merits of the United States' motion for interlocutory sale, the United States has established that an interlocutory sale of the PHONIX is appropriate. But it has not met its burden with respect to the oil cargo. Further, the United States' proposed procedure for conducting an interlocutory sale of the PHONIX provides inadequate protections for potential claimants. The proposed procedure amounts to nothing more than the United States finding a buyer and selling the PHONIX at a price that it thinks is fair. That provides far less protection than what Congress directed for sales of this sort. The United States does not persuasively explain why this Court should authorize such a dramatic deviation from the baseline set by Congress.

Accordingly, the Court will conditionally grant in part the Motion for Interlocutory Sale with respect to the PHONIX, and the Court will otherwise deny the motion without prejudice. The Court will allow an interlocutory sale of the PHONIX upon approving detailed procedures, to be proposed by the United States, consistent with the restrictions below. And the United States is free to renew its motion with respect to the oil cargo, explaining how that sale would be consistent with Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

**BACKGROUND**

The Court draws the relevant facts from the United States' filings in this action. The PHONIX is a crude oil tanker built in 2001. Compl. ¶ 27, ECF No. 1. It is owned and operated by Vision Ship Management LLP and Faith Enterprise Ltd., two India-based companies. *See* Compl. ¶¶ 30, 32. The PHONIX is a member of Iran's so-called "shadow fleet," a network of tankers and ship-management firms that transports Iranian oil for sale despite international sanctions. Compl. ¶ 31. According to the United States, the PHONIX transported oil from Iran several times in late 2025 and early 2026. Compl. ¶¶ 39–44.

In April 2026, the PHONIX was again loaded with Iran-origin crude oil—approximately 1.9 million barrels originating from Jask Oil Terminal in Iran. Compl. ¶¶ 45–46. It departed Jask

Oil Terminal and began broadcasting as the "MAJESTIC X" on publicly available ship-tracking websites. Compl. ¶ 47. The United States Coast Guard hailed the PHONIX to confirm its flag status. Compl. ¶ 48. Although the PHONIX's captain asserted that the vessel was Guyana-flagged, Guyanese officials confirmed to the United States that it was not. *Id.* The United States then treated the PHONIX as stateless and interdicted it. *Id.* The United States claims that the PHONIX and its cargo are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) because "it affords persons . . . sources of influence over the [Iran Revolutionary Guard Force]," which is "a designated foreign terrorist organization." Compl. ¶ 50.

The United States began this action on April 24, 2026, by filing a verified complaint for forfeiture *in rem* against the PHONIX and its cargo. Compl. at 19. It simultaneously filed a motion to seal the case and a motion for interlocutory sale. Mot. Seal, ECF No. 2; Mot. Interlocutory Sale, ECF No. 3. Another court in this District granted the motion to seal, and the case was assigned to this Court. *See* Mem. Op. & Order, ECF No. 4. Given the brevity of the United States' Motion for Interlocutory sale, the Court held a sealed status conference on May 5, 2026. *See* Sealed Min. Entry (May 5, 2026). At that status conference, the United States was unable to explain how the interlocutory sale it proposed would be consistent with Supplemental Rule G and related caselaw. The Court thus directed the United States to file a supplemental memorandum expanding on several aspects of its request for an interlocutory sale. *See* Sealed Min. Entry (May 5, 2026); Sealed Min. Order (May 6, 2026). The Court also ordered the United States to explain why the case should remain under seal. *See* Sealed Min. Order (May 6, 2026). A month later, the United States filed that supplemental memorandum. Mem., ECF No. 7.

## DISCUSSION

The Court begins by assessing whether this case should remain under seal, and then it turns to the United States' Motion for Interlocutory Sale.

### A. Sealing

The Court starts with the United States' request to maintain this case under seal. When considering a request to seal, the "starting point" is the "strong presumption in favor of public access to judicial proceedings." *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 980 (D.C. Cir. 2016) (quoting *EEOC v. Nat'l Child.'s Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)). To determine whether that presumption is overcome, a court "should weigh: '(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.'" *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (*quoting Nat'l Child.'s Ctr.*, 98 F.3d at 1409). The Court considers these factors in turn.

#### 1. Need for Public Access

The presumption in favor of public access "is particularly strong in this case because '[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party.'" *United States v. All Assets Held at Bank Julius Baer & Co.*, 520 F. Supp. 3d 71, 81 (D.D.C. 2020) (alteration in original) (quoting *Nat'l Child.'s Ctr.*, 98 F.3d at 1409). In such cases, "the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Id.* (quoting *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)). And that right is yet stronger in "proceedings related to criminal matters," including *in rem* forfeiture actions "founded on allegations of illegal activity" that are "in fact if not form, at least 'quasi-criminal' in nature." *Id.* at 82 (quoting *United States v. $191,910,00 in U.S. Currency*, 16 F.3d 1051, 1063 (9th Cir. 1994)).

"'[B]ecause the law presumes that the public is entitled to access the contents of judicial proceedings,' it is the party arguing against disclosure that has the burden to 'demonstrate the *absence* of a need for public access.'" *Id.* (quoting *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 140–41 (D.D.C. 2012)). Here, the United States concedes that the subject matter of this case is "of significant public concern." Mem. 19. But it argues that there is a countervailing interest weighing against disclosure: the need to keep secret (1) the identities of the third-party contractors assisting the Government's seizure of the PHONIX, and (2) the Government's investigative techniques. Mem. 19–20. The Court agrees that the public's need for such information is relatively weak. *See In re L.A. Times Commc'ns LLC*, 628 F. Supp. 3d 55, 65 (D.D.C. 2022) (explaining that "[r]eleasing information about the identities of third parties and details about law enforcement's investigative techniques does not aid" the "powerful public interest" in crimes potentially committed by a sitting Senator). But what this argument misses—and this will be a refrain repeated throughout this Memorandum Opinion—is that "lesser measures beyond wholesale sealing could suffice to mitigate those concerns, such as a request to seal certain docket entries on a filing-by-filing basis, targeted redactions of sensitive submissions, and so on." *Harvey v. Symons*, No. 25-cv-900, 2026 WL 289268, at *2 (D.D.C. Feb. 4, 2026). The United States does not explain why the public has a diminished interest in the mere existence of this case. Given that this is a quasi-criminal proceeding related to an ongoing international armed conflict, the need for public access is at its zenith, weighing strongly in favor of unsealing.

### 2. Extent of Previous Public Access

The second factor asks about "the extent of previous public access to the documents." *MetLife*, 865 F.3d at 665 (*quoting Nat'l Child.'s Ctr.*, 98 F.3d at 1409). "A district court weighing the second factor should consider the public's previous access to the sealed information, not its

previous access to the information available in the overall lawsuit." *CNN v. FBI*, 984 F.3d 114, 119 (D.C. Cir. 2021). As the court that considered the United States' prior request to seal this case noted, "[t]he seizure of the oil tanker has attracted national interest and been reported in major media outlets." Mem. Op. & Order at 3; *see, e.g.*, Eric Schmitt, *U.S. Forces Stop 2nd Tanker They Say Is Carrying Oil from Iran*, N.Y. Times (Apr. 23, 2026), https://www.nytimes.com/2026/04/23/world/middleeast/us-iran-oil-tanker-indian-ocean-mt-majestic-x.html [https://perma.cc/4LKR-UP2N] (describing the Government's announcement that it seized the M/T Majestic X); *see also* Compl. ¶ 47 (alleging that the PHONIX broadcasted as the "MAJESTIC X"). Indeed, the Government itself publicly trumpeted its seizure of the vessel, posting on social media that it had "board[ed] . . . the sanctioned stateless vessel M/T Majestic X transporting oil from Iran"—it even included a sixteen-second video of the seizure. Department of War US (@DeptofWar), X (Apr. 23, 2026, at 7:14 AM ET), https://x.com/DeptofWar/status/2047272909920444776 [https://perma.cc/7KWN-S9RT]. The U.S. Attorney for the District of Columbia followed up with more details, saying that "pursuant to a seizure warrant submitted by [her] office and signed by a federal magistrate, U.S. forces interdicted the dark fleet vessel, M/T Majestic (formerly known as the M/T Phonix), while carrying approximately 1.9 million barrels of Iranian oil in the Indian Ocean." US Attorney Pirro (@USAttyPirro), X (Apr. 23, 2026, at 9:55 PM ET), https://x.com/USAttyPirro/status/2047434329190490471 [https://perma.cc/WB6L-L8FJ].

The United States attributes this publicity to decisions by "[t]he U.S. Attorney for the District of Columbia and several government agencies over which the Department of Justice has no or limited control." Mem. 20. As an initial matter, the Court finds puzzling the United States' assertion that the Department of Justice lacks control over a U.S. Attorney, who is, of course, a

Department of Justice official. And federal agencies are undoubtedly agents of the United States. But this is all beside the point. The Department of Justice represents the United States. And although it may wish that its clients had adhered to a more coherent information-security strategy, the reality now is that the cat is out of the bag. Indeed, the Government's announcement of the seizure (and the U.S. Attorney's indication that there are concomitant legal proceedings) undercuts the United States' suggestion that disclosing the very existence of this case would endanger its investigation or U.S. personnel.

More on point is the United States' argument that the Government's prior announcements "provided little to no information about the instant proceedings or the current state or location of the PHONIX or its cargo . . . , and no document involved in the matter has been made publicly available." *Id*. That is true as far as it goes. Yet the existence of this action—which is the information that the United States is seeking to seal—has nevertheless been publicized. *See, e.g.*, Charles Gorrivan, *US Seeks Forfeiture of Seized Oil Tankers Linked to Iran*, Bloomberg (Apr. 29, 2026), https://www.bloomberg.com/news/articles/2026-04-29/us-seeks-forfeiture-of-iran-linked-oil-tankers-seized-at-sea [https://perma.cc/SJ6F-BLTA] (reporting that the United States is seeking forfeiture of the PHONIX, "according to a senior administration official"). The United States may of course seek to seal or redact specific documents containing information that has not been publicly released. But the fact remains that the public is already aware of the existence of this action, which weighs against keeping the case sealed in its entirety.

**3. Objections to Disclosure**

The third factor weighs "the fact that someone has objected to disclosure, and the identity of that person." *MetLife*, 865 F.3d at 665 (*quoting Nat'l Child.'s Ctr.*, 98 F.3d at 1409). Unsurprisingly, the United States objects to disclosure. Mem. 21. "Although litigants to a

proceeding have a lesser claim to privacy than third parties when they object in that proceeding," the United States "has a unique interest in protecting the integrity of its investigations, and it would be difficult for another third party—such as the source, a witness, or a specific law-enforcement officer—to object without revealing precisely the information the Government seeks to protect." *In re N.Y. Times Co.*, No. 21-mc-91, 2021 WL 5769444, at *5 (D.D.C. Dec. 6, 2021) (cleaned up). So "the fact" that the United States objects "counsels in favor of sealing." *Nat'l Child.'s Ctr.*, 98 F.3d at 1410. That said, the Court notes that in a scenario like this one, this factor will necessarily go the Government's way.

**4. Strength of Interests Asserted and Prejudice**

The fourth and fifth factors are "the strength of any property and privacy interests asserted" and "the possibility of prejudice to those opposing disclosure." *MetLife*, 865 F.3d at 665 (*quoting Nat'l Child.'s Ctr.*, 98 F.3d at 1409). These factors "can be considered together," *In re N.Y. Times Co.*, 2021 WL 5769444, at *5, and they ask "to what extent harm to legitimate interests, including privacy or law enforcement interests, would result from unsealing." *In re L.A. Times Commc'ns*, 628 F. Supp. 3d at 66.

The United States argues that unsealing this action would "(i) harm the ongoing criminal investigation into the vessel and the Iranian and non-Iranian individuals and entities responsible for its operations in support of Iran" and its affiliates; "(ii) reveal investigative techniques used by law enforcement in investigating terrorism financing, revenue generation, and sanctions evasion conspiracies, especially in the oil smuggling context; and (iii) harm legitimate national security interests." Mem. 22. These are undoubtedly weighty interests that the Court takes seriously. *See, e.g.*, *In re Press Application for Access to Judicial Records in Case No. 23-sc-31*, 704 F. Supp. 3d 161, 173 (D.D.C. 2023) (recognizing the "undeniable need to protect an ongoing criminal

investigation"); *In re L.A. Times Commc'ns*, 628 F. Supp. 3d at 66 ("Governmental interests can likewise be implicated by unsealing of closed investigation materials, as the government may generally 'withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" (quoting *In re WP Co.*, 201 F. Supp. 3d 109, 127 (D.D.C. 2016))); *In re the Reps. Comm. for Freedom of the Press*, 128 F. Supp. 3d 238, 241 (D.D.C. 2015) ("Courts have held that safety concerns may be a compelling interest that overrides the public's right of access to information."); *United States v. Hubbard*, 650 F.2d 293, 315–16 (D.C. Cir. 1980) ("The public has in the past been excluded, temporarily or permanently, from court proceedings or the records of court proceedings to . . . guard against risks to national security interests[.]").

Why, though, does unsealing the case implicate these interests? The United States does not really address that question. As discussed above, the seizure of the PHONIX and the existence of this proceeding are a matter of public record, in large part by the Government's own hand. And that—rather than any information about the investigation or investigative techniques—is what unsealing this case would make public.

As for the first two interests advanced by the United States, the Government offers nothing more than *ipse dixit*. When discussing purported harm to the investigation of the vessel, the United States briefly describes difficulties faced by investigators, states that the investigation remains ongoing, and then asserts that "[p]remature disclosure of this matter would jeopardize these investigative efforts." Mem. 22. Similarly, the Government avers that "premature disclosure" could compromise its investigative techniques and "cause the subjects of this and other terrorism financing and sanctions evasion investigations to change their conduct to evade detection and otherwise thwart future investigations of similar conduct." Mem. 23. But it says nothing about why

unsealing this case creates that risk. Unsealing this case does not necessarily mean that the public will have access to filings detailing the Government's investigative techniques.

The United States' asserted national-security concerns have slightly more heft. The Government notes that it remains in active hostilities with Iran and that there is a risk that Iran will retaliate for the seizure.[1] Mem. 23–24. According to the United States, that risk arises because unsealing "would include [disclosure of] information about the location of the PHONIX, the locations, identity, and capabilities (or lack thereof) of Government vessels in the region supporting the interdiction, and the identity of Government-contracted companies and their employees." Mem. 24. But that premise conflates unsealing this action with public disclosure of information in the United States' filings (which, to be clear, have been light on details of the sort that the Government is worried about disclosing). The national-security and safety concerns raised by the United States are entitled to substantial weight, but the United States has not explained why approaches short of sealing the case in its entirety—such as sealing or redacting particular documents—are not up to the task of addressing those concerns.

That brings the Court to a final issue. It asked the United States to explain why this case should be treated differently than another oil-vessel forfeiture case not under seal that is ongoing before another court in this District, *United States v. Motor Tanker Skipper*, No. 26-cv-697 (D.D.C.). *See* Sealed Min. Order (May 6, 2026). In that case, the United States similarly brought a forfeiture action against an oil vessel and associated oil cargo with alleged ties to Iran-affiliated

[1] Although the United States and Iran signed a ceasefire agreement in mid-June, *A Look at the Text of the Agreement Between the United States and Iran*, N.Y. Times (June 20, 2026), https://www.nytimes.com/2026/06/17/us/politics/us-iran-agreement-deal-text.html [https://perma.cc/C7FX-TCWV], intermittent fighting remains ongoing, *see, e.g.*, Helene Cooper et al., *U.S. Strikes Iran in Retaliation for Attack on Vessel in Strait of Hormuz*, N.Y. Times (June 26, 2026), https://www.nytimes.com/2026/06/26/world/middleeast/strait-of-hormuz-iran-attack.html [https://perma.cc/CZ5E-P4F6].

designated terrorist organizations. *See generally Motor Tanker Skipper*, No. 26-cv-697, ECF No. 1. The United States moved for an interlocutory sale, *id.* ECF No. 4, which the court granted, *id.* ECF No. 6. But shortly after, two parties entered the action and asked the court to stay that sale: (1) a group of claimants who hold a judgment against Iran and Iran-affiliated entities for their roles in the September 11 attacks, and (2) the owner of the vessel at issue. *Id.* ECF Nos. 9, 11. Both claimed an interest in the vessel, and both objected to the Government's decision to seek an interlocutory sale without providing them notice. *Id.* ECF No. 9 at 3–7, 12–13; *id.* ECF No. 11 at 2–3, 5–6. The dispute remains ongoing.

According to the United States, litigating those issues has caused a "delay" requiring the Government to "spend over $60,000,000 on maintaining the vessel and cargo," which is "an event [it] hope[s] not to repeat." Mem. 25. It frets that the claimants in the *Motor Tanker Skipper* case "contemplate returning the SKIPPER to service, which raises serious national security concerns that the vessel could fall back into ghost fleet activity." *Id.* The United States apparently believes that the lesson of *Motor Tanker Skipper* is that it should request sealing to skip the hassle of potential claimants objecting to an interlocutory sale. To state the obvious, the United States is mistaken. *Motor Tanker Skipper* underscores the importance of public access to forfeiture proceedings such as this one. *See Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) ("[H]owever weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest."). The United States might ultimately prevail, or it might not. Either way, a bare desire to proceed in secret to avoid adversarial testing is not a legitimate interest.

In sum, the United States asserts weighty interests that support sealing. But for the reasons explained above, there is not much connection between these interests and the United States' requested relief: maintaining the entire case under seal. Because a lesser degree of secrecy (*i.e.*, sealing or redacting particular documents) would also protect the United States' interests, this factor tilts only slightly in favor of the United States.

**5. Purposes for Which the Documents Were Introduced**

The sixth and final factor is "the purposes for which the documents were introduced during the judicial proceedings." *MetLife*, 865 F.3d at 665 (*quoting Nat'l Child.'s Ctr.*, 98 F.3d at 1409). This factor is a poor fit because the United States seeks to seal the case in its entirety, rather than sealing any particular documents. Yet the United States "voluntarily commenced" this proceeding and "invoked the jurisdiction of this Court to do so." *Upshaw v. United States*, 754 F. Supp. 2d 24, 30 (D.D.C. 2010). To the extent this factor is relevant, it weighs against sealing.

* * *

Sealing a case in its entirety is a "drastic remedy." *John Doe Co. No. 1 v. CFPB*, 195 F. Supp. 3d 9, 16 (D.D.C. 2016). The court considering the United States' prior request at an "early stage" concluded that the United States had "satisfied its burden to overcome the presumption in favor of public access to court records." Mem. Op. & Order at 2. But as this case has progressed and the practicalities of the request for interlocutory sale have come into sharper focus, the factors now weigh in favor of unsealing. Targeted requests for sealing and redaction remain available—and likely appropriate—tools that the Government may request to protect its legitimate interests. Ultimately, however, "although certain aspects of the Government's investigation may remain confidential, the simple fact that [the PHONIX] is being investigated is not a secret and does not justify continuing the seal on this action." *ISS Marine Servs.*, 905 F. Supp. 2d at 141–42. The Court

will unseal this case and order the United States to submit versions of all filings in this case—including this Memorandum Opinion—with proposed redactions, along with a motion to seal those portions of the filings, by July 22, 2026.

### B. Motion for Interlocutory Sale

The Court turns to the United States' Motion for Interlocutory Sale. It begins by explaining Supplemental Rule G's design for interlocutory sales, and then it addresses how that scheme applies here.

#### 1. Supplemental Rule G

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions "governs a forfeiture action in rem arising from a federal statute." Fed. R. Civ. P. Supp. R. G(1). That rule permits a court to "order all or part of the property sold" under certain conditions, with proceeds constituting "a substitute res subject to forfeiture in place of the property that was sold." *Id.* R. G(7)(b)(i), (iv). This is called an interlocutory sale. One condition permitting an interlocutory sale is if "the expense of keeping the property is excessive or is disproportionate to its fair market value." *Id.* R. G(7)(b)(i)(B). Another is if "the court finds other good cause." *Id.* R. G(7)(b)(i)(D). "Since Supplemental Rule G(7)(b)(i) does not state any criteria to guide the judge, the judge can range widely in deciding what factors to consider, and what weight to give them, in making his ruling." *United States v. The M/Y Amadea*, No. 23-cv-9304, 2024 WL 2946071, at *1 (S.D.N.Y. June 11, 2024) (cleaned up). "[A]s the movant, the Government bears the burden of showing interlocutory sale is appropriate." *Id.* at *6.

The rule incorporates by reference 28 U.S.C. §§ 2001, 2002, and 2004 to provide procedures governing any interlocutory sale. Fed. R. Civ. P. Supp. R. G(7)(b)(iii). Those provisions split property into two categories: realty and personalty. *See* 28 U.S.C. §§ 2001, 2002,

2004; *see also Personalty*, Black's Law Dictionary (12th ed. 2024) (defining "personalty" as "[p]ersonal property as distinguished from real property"). Sales of realty are further subdivided into two kinds of sales: public sales and private sales. *See* 28 U.S.C. § 2001. For a public sale, a court must first require "notice published once a week for at least four weeks prior to the sale in at least one newspaper." *Id.* § 2002. Then, "upon such terms and conditions as the court directs," the realty "shall be sold . . . at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein." *Id.* § 2001(a).

For a private sale, a court must require "notice to all interested parties . . . by publication or otherwise" and then hold a hearing. *Id.* § 2001(b). At that point, the court may order a private sale "upon such terms and conditions as the court approves." *Id.* But before confirming that sale, "the court shall appoint three disinterested persons to appraise such property." *Id.* "No private sale shall be confirmed at a price less than two-thirds of the appraised value," and "[t]he private sale shall not be confirmed if a bona fide offer is made . . . which guarantees at least a 10 per centum increase over the price offered in the private sale." *Id.* Further, "[b]efore confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation." *Id.*

As compared to sales of realty, Congress provided less direction for sales of personalty. It said only: "Any personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, unless the court orders otherwise." *Id.* § 2004.

**2. Application**

Now to apply these principles. The Court first addresses whether an interlocutory sale is warranted. With respect to the PHONIX, the Court concludes that it is. But with respect to the oil

cargo, the United States has not yet shown that Supplemental Rule G justifies such a sale. The Court then addresses what procedures it will require for an interlocutory sale of the PHONIX.

**a. Appropriateness of Interlocutory Sale**

In its exceptionally terse Motion for Interlocutory Sale, the United States contends that this Court should authorize an interlocutory sale because the United States "expects significant fees associated with the repairs and maintenance of the Defendant Property pending the resolution of the instant matter." Mot. Interlocutory Sale ¶ 9. In other words, it appears to rely solely on the excessive-or-disproportionate prong of Supplemental Rule G(7)(b)(i) to justify the sale. *Id.* ¶ 5.[2]

Alongside the motion, the United States submitted a declaration from Gene Patton, Chief in the Program Operations Unit for the Criminal Division of the Department of Justice. Patton Decl. ¶ 1, ECF No. 3-1. Mr. Patton stated that "the United States is anticipating spending $15 million manning a custody crew, repairing serious safety and operational deficiencies, maintaining and transiting the M/T PHONIX"—which would "increase by approximately $5 million or more if the vessel remains in U.S. custody . . . for hurricane season." *Id.* ¶ 8a. He estimated storage costs for the petroleum cargo would be $450,000 a month. *Id.* ¶ 8d. And he

[2] The United States' initial Motion for Interlocutory Sale mentions that Supplemental Rule G also authorizes an interlocutory sale if "the court finds other good cause." Mot. Interlocutory Sale ¶ 5, ECF No. 3 (quoting Fed. R. Civ. P. Supp. R. G(7)(b)(i)(D)). It also references that courts sometimes authorize interlocutory sales "in order to avoid ongoing storage costs or depreciation." *Id.* ¶ 11. But the United States does not adduce facts supporting that the value of the defendant property is deteriorating or that there is otherwise good cause for an interlocutory sale. To the extent that the United States intended to rely on provisions other than Supplemental Rule G(7)(b)(i)(B) to support an interlocutory sale, the Court reminds it that "[m]entioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

estimated the value of both the vessel and the cargo: $3 million or less for the vessel, and between $130 million and $140 million for the cargo. *Id.* ¶ 8b–8c.

After the Court pressed the United States for more details about the costs associated with holding this property pending resolution of this action, the United States submitted a second declaration from Mr. Patton. Second Patton Decl., ECF No. 7-1. In that second declaration, Mr. Patton asserted that after a closer inspection of the PHONIX, "the Government has incurred a spending outlay of $41.8 million through the end of May 2026"—nearly three times his initial estimate of $15 million—"with further costs continuing to increase until the crude oil and vessel itself can be sold." *Id.* ¶ 5. He predicted that "custody, maintenance and repairs of the vessel" would incur an additional "$5 million or more with the onset of bad weather," and that storage expenses for the vessel would cost approximately $700,000 a month. *Id.* ¶¶ 5, 10. And he further stated that "these costs will increase significantly" (though he provided no estimate for how much that means) "if the Government's Interlocutory Sale Motion is not granted." *Id.* ¶ 6.

The United States argues that these figures reflect that "the expense of keeping the property . . . is disproportionate to its fair market value." Fed. R. Civ. P. Supp. R. G(7)(b)(i)(B); *see* Mem. 15–16. With respect to the PHONIX itself, the Court agrees that this is a straightforward case. Even discounting costs that the Government has already incurred, *see The M/Y Amadea*, 2024 WL 2946071, at *1 n.3, maintenance and storage costs for the PHONIX will quickly reach its estimated value. This is precisely the sort of situation that Supplemental Rule G(7)(b)(i)(B) is designed to address. The Court will thus grant the United States' motion with respect to the PHONIX, subject to the conditions discussed below.

Things are not so simple with respect to the PHONIX's oil cargo. The United States contends that the cost of keeping the cargo ($450,000 monthly) is disproportionate to its estimated

market value ($130 million to $140 million). Mem. 16. That means that the monthly cost of keeping the oil cargo is about 0.35% of its value. *Id*. But according to the United States, "[c]osts are 'disproportionate' to an asset's fair market value if they are notably high relative to the asset's fair market value." Mem. 15. Why is a monthly cost of 0.35% "notably high"? The United States says that "[t]here is no mathematical cut-off." *Id.* Even if that is true, the Court struggles to understand how 0.35% is "notably high."

The United States goes on to point out that "courts have often granted interlocutory sale where monthly maintenance expenses approached .5% of the asset's fair market value." *Id.* But its supporting cases are far more mixed than it suggests. Some of them rely on other authority for ordering an interlocutory sale in addition to the costs of keeping the property. *See United States v. Any and All Funds in UBS AG, Account No. XXXX1138*, 628 F. App'x 296, 298 (5th Cir. 2016) (per curiam) (unpublished) ("The record on appeal supports the district court's decision to sell the Hawker airplane in order to avoid the loss in value from depreciation as well as maintenance and storage costs."); Min. Entry, *United States v. The M/Y Galactica Star*, No. 17-cv-2166 (S.D. Tex. Mar. 20, 2019) ("The Court also finds that the yacht is subject to market value depreciation and deterioration while it remains in the Government's possession."); *Freret Marine Supply v. M/V ENCHANTED CAPRI*, No. 00-cv-3805, 2001 WL 649764, at *2 (E.D. La. June 11, 2001) (relying on Supplemental Rule E(9)(b)(i)(A) and (C) in addition to Supplemental Rule E(9)(b)(i)(B)). In others, the courts did not elaborate on why they found the relevant cost excessive or disproportionate, so the Court cannot draw much from them (and they, too, buttress their conclusions with additional authority). *See Caterpillar Fin. Servs. Corp. v. Coleman*, No. 99-cv-3821, 1999 WL 33218595, at *2 (C.D. Cal. Aug. 19, 1999) (concluding that a claimant's failure to secure a vessel's release by posting a bond made an interlocutory sale proper under

Supplemental Rule E "on [that] ground alone," and then stating that "the expense of keeping the [vessel] in custody . . . also appears to be excessive"); Findings & Recommendation at 5, *United States v. $1,133,648.97 Seized from Bank of Hawaii*, No. 07-cv-175, ECF No. 68 (D. Haw. Nov. 2, 2007) (relying also on certain assets depreciating); Order Adopting Findings & Recommendation at 8–9, *$1,133,648.97 Seized from Bank of Hawaii*, ECF No. 85 (D. Haw. Mar. 11, 2008) (same). And one involved a much larger proportional expense than the United States admits. *United States v. One 2005 Lagoon 440 Sailing Catamaran Named The Bohemian Rhapsody*, No. 13-cv-9262, 2017 WL 10573808, at *2 (C.D. Cal. Sep. 22, 2017) (taking into account "$58,000 in accumulated storage costs," which meant that costs were "approximately 30% of the . . . valuation of the vessel and growing").

The United States also cites *United States v. Motor Tanker Tifani*, No. 26-cv-1317 (D.D.C.), an ongoing case in which another court in this District considered a motion for interlocutory sale of an oil tanker's cargo with the identical value as here. *See* Mem. 16. But that court did not find the $450,000 storage cost disproportionate to the estimated market value of $130 to $140 million. Mem. Op. & Order at 4–5, *Motor Tanker Tifani*, ECF No. 6. Rather than relying on Supplemental Rule G's "disproportionate" prong—as the United States suggests, Mem. 16—it relied on the rule's "other good cause" provision, Fed. R. Civ. P. Supp. R. G(7)(b)(i)(D). Mem. Op. & Order at 4–5, *Motor Tanker Tifani*, ECF No. 6. So, *Motor Tanker Tifani* does not advance the United States' argument either.

Given all this, here is the problem: the United States does not present an affirmative theory for why this Court should consider a monthly expense of $450,000 to be disproportionate to (or, to use the United States' variation, "notably high relative to") the cargo's $130 to $140 million market value. Mem. 15–16. And although it argues that this Court should follow other cases (many

of which are distinguishable), it does not even bother to explain why this Court should find those cases persuasive. The United States does not carry its burden on this record.

The United States also contends that the Court should grant its motion with respect to the oil cargo under a different theory—because "the expense of keeping the property is excessive." Fed. R. Civ. P. Supp. R. G(7)(b)(i)(B). It says that the Court should interpret that language to mean "more than what is usual as compared to the costs for other assets of similar value." Mem. 17 (emphasis omitted). As support for that interpretation, it cites only one journal article. Mem. 17 n.3 (citing Stefan D. Cassella, *Confiscation and Forfeiture – Making It Work or Why Is It Taking So Long to Forfeit the Russian Yachts?*, 46 The Co. Law. 292, 294 (2025)). The Court is reluctant to order the interlocutory sale of $130 to $140 million of oil cargo—secretly, if the United States had its way—based on a single journal article.

But even if the Court were to adopt that interpretation, the United States' proposed comparator assets seem handpicked to get the United States its desired result. The United States suggests that the Court should compare the cost of keeping the oil cargo to the cost of maintaining securities, land, a painting, or jewelry. Mem. 18. Setting aside the fact that it cites nothing to quantify the costs of keeping such assets (it says only that "[i]t is likely that none of those assets would require even close to $450,000 per month to maintain," *id.*), why should the Court not make a comparison to—say—an airplane, building, train, or yacht? Why should the Court interpret the rule in a way that would permit an interlocutory sale whenever the subject asset costs more to maintain than an undefined set of cheaply maintainable assets of comparable value?

In the end, this Court may not order an interlocutory sale simply because the United States asks it to do so. Supplemental Rule G permits such sales only in limited circumstances precisely because it would dispose of assets before the case has been resolved on the merits. And here, in a

case in which the United States seems intent on disposing of the subject assets without adversarial testing, the Court is yet to be persuaded. The United States has not yet adequately explained why the cost of keeping the oil cargo "is excessive or is disproportionate to its fair market value." Fed. R. Civ. P. Supp. R. G(7)(b)(i)(B). That said, the Court recognizes that the cases in this area are sparse, and that the United States might wish to rely on theories that it has thus far not clearly advanced. Accordingly, it will deny without prejudice the United States' motion with respect to the oil cargo. If the United States wishes to put in the work to explain why Supplemental Rule G(7)(b)(i) would authorize the requested interlocutory sale, it may renew its motion. But the Court will not fill the gaps that the United States has thus far left in its arguments.

**b. Procedure**

Oil cargo aside, there remains the question of how to effectuate an interlocutory sale of the PHONIX. This is how the United States proposes proceeding: for the vessel, it would "engage[] with various shipping and salvage companies to determine interest in the sale of the vessel." Mem. 12; *see also* Mot. Interlocutory Sale ¶ 15 ("[T]he government seeks authority to solicit bids from various interested purchasers for the Defendant Property, and if a reasonable offer is made, to promptly sell the Defendant Property[.]"). And it assures the Court that it will decline to execute a sale if "there is no offer for a reasonable market value." Mem. 12. In other words, the United States plans to shop around and see if there is any interest, executing a private sale if it thinks the price is good based on its own assessment of the PHONIX's value—and given its request to maintain this case under seal, the United States was planning to do so in secret.

That is a far cry from how Supplemental Rule G envisions interlocutory sales should proceed. As discussed above, that rule directs that interlocutory sales are "governed by 28 U.S.C. §§ 2001, 2002, and 2004." Fed. R. Civ. P. Supp. R. G(7)(b)(iii). And for a private sale like the

United States proposes, those provisions contemplate a considerable amount of process: among other things, "notice to all interested parties . . . by publication or otherwise," a hearing, and appraisals by "three disinterested persons." 28 U.S.C. § 2001(b); *see also id.* § 2004 (providing that a sale of personalty shall be conducted consistent with Section 2001).

The United States contends that all this process is unnecessary. It highlights that 28 U.S.C. § 2004—which governs the sale of the defendant property—says that a sale like this one shall follow these procedures "unless the court orders otherwise." Mem. 13. And here, it says, there is good reason to deviate. *Id.* The required hearing "would be impractical for a sealed case like this one," and the required appraisals "would be difficult and time-consuming to arrange given the PHONIX's remote location." *Id.* The notice requirements, the United States submits, would "further delay sale." *Id.*

This is not persuasive. Section 2004 clearly contemplates that the full set of procedures for a sale of realty is the baseline, and the Court will not lightly throw them away. Those procedures are designed to ensure notice, transparency, fairness, and the avoidance of corruption or the appearance of corruption. They do not provide for speed at all costs. That stands in stark contrast to the United States' proposed plan to secretly sell off the defendant property.

Nevertheless, the Court acknowledges that the location and other features of the PHONIX make some adjustments appropriate. But those adjustments must result in a process that achieves the same goals as Congress's baseline procedures. Accordingly, the Court will proceed as follows. The Court will conditionally grant the United States' Motion for Interlocutory Sale with respect to the PHONIX. The condition is that the United States must submit for approval—and the Court must approve—a detailed set of procedures for the sale. That plan must contain, at minimum, the following features:

- Direct notice provided to any potential claimants of which the United States is aware at least three weeks prior to any sale.
- Public notice of the United States' plan to interlocutorily sell the PHONIX at least three weeks prior to any sale.
- An appraisal of the PHONIX by one independent appraiser. The United States' submission shall detail the credentials of the proposed appraiser, as well as explain when and how the appraiser will conduct the appraisal.
- Submitting for the Court's approval any sale prior to execution, the details of which shall be filed on the public docket (subject to any redactions authorized by the Court).

Once the Court approves the United States' plan, the United States may begin seeking out and/or soliciting prospective buyers. But the Court reiterates that the United States' submission must be detailed—for instance, it must provide specifics regarding the when and how of the notice required above. If the United States submits a plan as skeletal as some of its filings to date, responsibility for further delays will lay at its feet.

## CONCLUSION

For the foregoing reasons, the Court conditionally grants in part and denies without prejudice in part the United States' Motion for Interlocutory Sale, ECF No. 3. The United States shall file detailed proposed procedures by July 15, 2026. Further, the Court directs the Clerk of the Court to unseal this case. The Court orders the United States to submit proposed redacted versions

of all filings and a corresponding motion to seal by July 22, 2026. All filings in this case shall remain under seal until further order of this Court.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: July 8, 2026